**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**EDWIN APONTE** | **CRIMINAL ACTION**<br>**NO. 25-227-1** |

# MEMORANDUM OPINION

Defendant Edwin Aponte ("Aponte") has been charged for his alleged involvement in the June 3, 2024 carjacking and kidnapping of D.P. and R.G. with one count of federal carjacking, in violation of 18 U.S.C. §§ 2119 and 2; two counts of federal kidnapping, in violation of 18 U.S.C. §§ 1201(a) and 2; and one count of using or carrying a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2. Some of the evidence against Aponte was obtained through a search of his cell phone, and he now moves to suppress this evidence, arguing that the warrant application authorizing that search was defective because it: (1) contained a serious misstatement of fact; and, (2) was fatally overbroad. For the reasons that follow Aponte's Motion will be denied.

## I. FACTUAL BACKGROUND

On June 3, 2024, D.P. and R.G. were lured to Philadelphia, robbed at gunpoint, abducted, and ultimately abandoned in a cemetery with their hands zip-tied and their heads covered.

In an interview after-the-fact, D.P. explained the context for the events of that day as follows: it started with a number of skill machines[1] he had listed for sale on Facebook

[1] A "skill machine" is an electronic gaming device resembling a traditional slot machine but incorporating a component in which a player's skill affects the outcome of the game. *See* 4 Pa. C.S. § 1103 (defining a "skill slot machine" as one in which "the skill of the player, rather than the element of chance," predominates in determining the outcome); *In re Three Pa. Skill Amusement Devices*, 358 A.3d 385, 394-95 (Pa. 2026) (describing the devices as resembling slot machines while incorporating a skill component).

Marketplace. After being contacted by a prospective buyer and receiving a deposit on June 2, 2024, the next day, D.P. and his father-in-law, R.G., drove to Philadelphia in a U-Haul with the machines to complete the sale. When they arrived, they met with two men in a red Chevrolet SUV who identified themselves as the buyers. The men directed D.P. and R.G. to follow them to another location, purportedly to deliver the machines and collect the remaining purchase price. But after parking the U-Haul, a black Jeep Cherokee pulled up and two men in ski masks, armed with handguns, got out. They bound D.P.'s hands behind his back with zip ties, put a bag over his head, took his cellphone, wallet, and necklace, and forced him into the Jeep. And then they did the same to R.G. The men drove them a short distance and then ordered D.P. and R.G. out of the vehicle and told them to walk away. Once he heard the Jeep drive off, D.P. removed the bag from his head to discover they had been left in a cemetery.

Working from a description of the red Chevrolet and its occupants, the Philadelphia Police were able to identify the vehicle and its driver, Jose Polanco-Lopez ("Polanco-Lopez"). Polanco-Lopez told police that a friend had recruited him to help recover a stolen skill machine. He further explained that he had connected that friend with a man known as "Cano" or "Rojo"—later identified as Aponte through an Instagram photo—and that "Cano" was the owner of the black Jeep involved in the incident.

Investigators were also able to obtain surveillance footage, allowing them to track the paths of the U-Haul, Chevrolet, and Jeep, and the routes that took them from the initial meet up location, to the cemetery, and then back to Kensington Avenue. The footage then showed a person who the government identifies as Aponte parking and exiting the driver's seat of the Jeep with the keys, locking it, then talking on his cell phone before meeting up with some of the other individuals allegedly involved in the kidnapping and robbery.

Police arrested Aponte on an unrelated matter and questioned him about the June 3 robbery and abduction. Aponte told detectives that a person he knew as "JR"—whom he subsequently identified as Polanco-Lopez—had asked for his help retrieving one of the machines. According to Aponte, he merely put JR in contact with others who could assist but was otherwise uninvolved. During that interview, however, Aponte identified himself in surveillance images taken on the day of the robbery, including an image showing him in possession of the Jeep's keys. Based on that information, Aponte's cell phone was seized, and officers sought, and obtained, a warrant to search its contents.

## II. LEGAL STANDARD

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrant shall issue, but upon probable cause, supported by Oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Aponte's Motion implicates two requirements of the Warrant Clause: that a warrant be supported by oath or affirmation and that it particularly describe the place to be searched and the things to be seized.

To satisfy the oath requirement, a search warrant must be supported by an oath or affirmation by a law enforcement agent, generally in the form of a sworn affidavit. *United States v. Bansal*, 663 F.3d 634, 662 (3d Cir. 2011). Although such affidavits are entitled to a presumption of validity, a criminal defendant may challenge the veracity of the statements contained therein. *See Franks v. Delaware*, 438 U.S. 154, 155-56, 171 (1978). To bring this challenge, the defendant must satisfy a two-part test. *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (citing *Franks*, 438 U.S. at 155-56). First, he must make a "substantial preliminary showing" that (1) "the affidavit contained a false statement, which was made

knowingly or with reckless disregard for the truth;" and, (2) the statement was "material to the finding of probable cause." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (citing *Sherwood*, 113 F.3d at 399). If that showing is made, the defendant is entitled to a *Franks* hearing. And if, and only if, at that hearing he then proves both elements by a preponderance of the evidence, "the fruits of the search [are] excluded to the same extent as if probable cause was lacking on the face of the affidavit." *United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993) (citing *Franks*, 438 U.S. at 155-56).

The particularity requirement—the "touchstone of a warrant," *Doe v. Groody*, 361 F.3d 232, 239 (3d Cir. 2004)—guards against unbridled government discretion in the execution of a search by barring overbroad and general warrants, *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents,* 307 F.3d 137, 149 (3d Cir. 2002) (Alito, J.). A general warrant "vest[s] the executing officers with unbridled discretion to conduct an exploratory rummaging" for evidence of crime. *Id.* (quoting *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982). "An overly broad warrant 'describe[s] in both specific and inclusive generic terms what is to be seized,'" yet still authorize the seizure of items for which probable cause is lacking. *Id.* (quoting. *Christine*, 687 F.2d at 755-54). While a true general warrant requires total suppression of the fruits of the search, *Christine*, 687 F.2d at 758, an overly broad warrant may be remedied by only the suppression of evidence seized pursuant to those portions of the warrant unsupported by probable cause. *Ninety-Two Thousand*, 307 F.3d at 149.

## III. DISCUSSION

### A. Oath Requirement

Aponte's first challenge, brought pursuant to *Franks v. Delaware*, 438 U.S. at 155-56, is to a supposed misstatement in the probable cause affidavit. He argues that, because the license plate of the black Jeep was not visible in all of the surveillance footage to trace the vehicle's

route, the use of the definite article "the" incorrectly "led the magistrate to believe that the black Jeep that was seen entering the cemetery was the same one seen earlier in close proximity to the u-Haul truck."[2]

Even assuming for present purposes that the statement was false,[3] Aponte has failed to make the requisite "substantial preliminary showing" that the affiant made that statement to deliberately deceive the magistrate or with a reckless disregard for the truth.[4] *See Franks*, 438 U.S. at 164-65 (explaining that "truthful" does not mean "that every fact recited in the warrant affidavit is necessarily correct" but that "the information put forth is believed or appropriately accepted by the affiant as true"); *United States v. Brown*, 3 F.3d 673, 678 (3d Cir. 1993) (inaccuracies in the affidavit did not support an inference that officer was recklessly or deliberately untruthful)*; see also United States v. Stanford*, 75 F.4th 309, 315 (3d Cir. 2023) ("even substantiated assertions of mere negligent misrepresentation don't suffice"). Aponte may not "rest on mere conclusory allegations or a 'mere desire to cross-examine.'" *United States v. Desu*, 23 F.4th 224, 234 (3d Cir. 2022) (quoting *Yusuf*, 461 F.3d at 383 n.8). For his challenge to

[2] The warrant affidavit states, in relevant part:

> Several cameras capture the involved vehicles, along with the complainant's U-Haul, including the route the offenders take to the initial meeting location from Kensington, arrival to the cemetery and return to Kensington Ave. Cameras capture the tag of the Jeep as PA MGP -7721. The black Jeep is captured entering the cemetery where the complainants were dropped off and then exiting the cemetery. The black Jeep is then observed returning to Kensington Ave and parking on the 500 block of Hart Lane. Aponte is seen on camera exiting from the driver seat, with the keys and locking the vehicle.

[3] The record does not necessarily establish actual falsity. If detectives reviewed multiple cameras depicting a black Jeep traveling along the relevant route, entering and leaving locations at times consistent with a continuous journey, and ultimately arriving where the defendant was observed exiting the driver's seat, describing the vehicle throughout the narrative as "the black Jeep" may simply reflect the investigators' inference from the sequence of footage that it was the same vehicle. The fact that a particular camera angle did not show the license plate does not conclusively establish otherwise.

[4] "[A]ssertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting." *See United States v. Desu*, 23 F.4th 224, 234 (3d Cir. 2022) (quoting *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000)).

proceed, he "must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." *Id.* Aponte offers no such proof from which it could be inferred that Rosenbaum deliberately misled the issuing judge or recklessly disregarded the truth, and thus his *Franks* challenge does not get off the ground.

Nor does Aponte establish that this supposed misstatement is material to the finding of probable cause. Under *Franks*, if, after the challenged material is set aside, "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-72.

Probable cause exists if the totality of the circumstances suggests that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). It is a "fluid concept" that turns on "the assessment of probabilities in particular factual contexts." *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Gates*, 462 U.S. at 232). The inquiry, therefore, looks to the "whole picture," recognizing that "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *District of Columbia v. Wesby*, 583 U.S. 48, 60-61 (2018); *see also Cummings v. City of Philadelphia*, 137 F. App'x 504, 506 (3d Cir. 2005) ("In assessing whether probable cause exists, the inculpatory evidence should be weighed against the exculpatory evidence to determine whether a reasonable person would believe an offense has been committed by the suspect.").

So, excising the offending "the" and replacing it with Aponte's proposed formulation—that *a* black Jeep was seen entering the cemetery—the affidavit would still contain sufficient inculpatory information linking him to the carjacking to support a finding of probable cause. *See Gates*, 462 U.S. at 235 (probable cause requires "only the probability, and not a prima facie

showing, of criminal activity.”). A coconspirator linked the Jeep involved in the offense and Aponte, and implicated him in arranging the retrieval of the skill machines. Surveillance footage showed Aponte speaking with other participants in the aftermath of the offense. And Aponte himself admitted that he had been asked to assist in retrieving the machines and identified himself in a surveillance still taken after he had parked a black Jeep. Thus, even if the cemetery footage did not conclusively establish that the particular Jeep associated with Aponte entered the cemetery, the affidavit still placed him in possession and control of a matching vehicle immediately after the robbery, connected him to the other participants, and included his own admission that he helped facilitate the effort to recover the property at the center of the scheme.

**B. Particularity Requirement**

If probable cause establishes the basis for a search, particularity defines its permissible scope. *Yusuf*, 461 F.3d at 392-93; *see also Groody*, 361 F.3d at 239 (3d Cir. 2004) (explaining that a warrant must be “sufficiently definite and clear so that the magistrate, police, and search subjects can objectively ascertain its scope”). “Whether a warrant is sufficiently particularized turns on the nexus between the evidence to be sought or seized and the alleged offenses.” *United States v. Fallon*, 61 F.4th 95, 107 (3d Cir. 2023) (citing *Yusuf*, 461 F.3d at 394). The degree of specificity required for that analysis depends upon “the particular factual context of each case and also the information available to the investigating agent that could limit the search at the time the warrant application is given to the magistrate.” *Yusuf*, 461 F.3d at 395.

Aponte argues that the warrant violated the Fourth Amendment’s particularity requirement because it was overly broad in that it “gave no specific details as to how [his] cell phone was connected to this crime” and “failed to cabin the scope of the search to the evidence for which probable cause was actually established.” In his view, because the affidavit did not “establish that the phone itself was an instrumentality of the alleged offense, *any* search of the

device's contents exceeds the permissible scope." (emphasis added). Although Aponte frames his challenge in terms of overbreadth, his argument implicates two related but distinct questions: whether there was probable cause to believe that evidence of the offenses would be found on his cellphone at all, and, if so, whether the warrant sufficiently limited the scope of the authorized search.

With respect to whether his phone should have been searched at all, Aponte's argument that the warrant affidavit fails to link his cell phone to the offenses does not withstand scrutiny. [5] To the contrary, the affidavit described how D.P. and R.G. were lured to Philadelphia through an online transaction, how D.P. communicated with one of the defendants through Facebook, and how a payment was made through a digital payment platform. It further explained that a coconspirator put the person seeking to retrieve the skill machines "in contact" with Aponte and that Aponte himself acknowledged that he had been asked to help and had connected that person with others who could assist. The affidavit also detailed the coordinated conduct of the occupants of two vehicles—one of which was allegedly driven by Aponte—during the robbery and kidnapping. A coconspirator stated that he had received text message instructions during the act, and most directly, the affidavit stated that surveillance footage captured Aponte speaking on a cellphone in the direct aftermath of the crime before meeting up with the other participants. The affidavit also explained why evidence of a jointly committed crime could appear in different locations on a smartphone, including communications, location information, photographs, social-media applications, and other stored data. Taken together with the case-specific facts, this linked

[5] The Government argues that an officer's training and experience may, standing alone, establish the requisite nexus, relying on *United States v. Whitner*, 219 F.3d 289 (3d Cir. 2000). We need not consider this question in isolation because the warrant at issue contains more than just the affiant's assertion that—as Aponte puts it—"cell phones are useful when investigating a crime." The conclusions of the affiant are part of the totality of the circumstances and are considered alongside the other facts set forth in the affidavit.

the charged conduct to likely cell phone use, and therefore supplied a substantial basis to conclude that there was a "fair probability" that evidence of the kidnapping and robbery would be found on Aponte's phone. *See Gates*, 462 U.S. at 238; *cf. United States v. LaCosta-Franco*, 828 F. Supp.3d 543, 559 (E.D. Pa. 2026) (Weilheimer, J.) (suppressing evidence obtained from a cellphone warrant where the affidavit lacked offense-specific evidence linking the phones to the charged crimes and explaining that "something in the way of objective information related to Defendant's phones is needed to buttress the officer's training and experience"); *United States v. Williams*, 813 F.Supp. 3d 503, 524-25 (E.D. Pa. 2025) (Weilheimer, J.) (finding no probable cause where nothing beyond the officer's "training and experience" suggested that the cellphone contained evidence of the drug offense).

Regarding the scope of the cell phone search, Aponte also argues that the warrant authorized an "unlimited 'rummaging' through the device's contents." But this argument also fails.

In the context of electronic searches, the practical realities of digital storage may require "a broad, expansive search" to locate evidence within the scope of the warrant because electronic files can be hidden, mislabeled, or manipulated. *United States v. Stabile*, 633 F.3d 219, 237 (3d Cir. 2011). Thus, "when a search requires review of a large collection of items," some innocuous material will necessarily be examined, at least cursorily, to determine whether it falls within the warrant's authorization. *Id.* at 234 (quoting *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976)); *see also United States v. Karrer*, 460 F. App'x 157, 162-63 (3d Cir. 2012) (nonprecedential) (holding that a warrant authorizing the search and seizure of electronic devices was not overbroad "simply because the devices and files it authorized to be searched and seized were likely to include materials unrelated" to the offense); *United States v. Vetri*, 811 F. App'x

79, 82 (3d Cir. 2020) (nonprecedential) (explaining that law enforcement may conduct "a cursory review of all electronic files").

Consistent with those principles, warrants may describe the objects of a search in "specific and inclusive generic terms," *Christine*, 687 F.2d at 753, including categories of electronic information, so long as the warrant sufficiently limits the search to evidence of identified criminal conduct. *See Bansal*, 663 F.3d at 662 (rejecting a challenge to a warrant authorizing search of email where it "particularly described several categories of records: information on accounts, billing, payment, and 'stored electronic information or files' associated with [defendant]'s email accounts"). Courts in this Circuit have rejected particularity challenges to cell-phone warrants where the warrant identified the device to be searched, specified the categories of electronic information subject to search, and limited the search to evidence of identified criminal conduct. *See United States v. Murphy*, 2024 WL 3440149, at *12-14 (D.N.J. July 17, 2024); *United States v. Reese*, 2021 WL 4429429, at *4-6 (W.D. Pa. Sept. 27, 2021); *United States v. Dewald*, 361 F. Supp. 3d 413, 418-19, 421-22 (M.D. Pa. 2019).

The warrant here did precisely that. It identified the "place" to be searched as a "[b]lack [c]ellphone in a black and green case," and although it identified numerous categories of potentially searchable electronic data—including messages, emails, photographs, videos, call logs, location information, internet history, and application data—it expressly limited the items to be searched for and seized as "the evidence or fruits or motive or planning or modus operandi related to the June 3, 2024 Kidnapping and Armed Robbery of complainants 'D.P' and 'R.G.'" *See United States v. Conley*, 4 F.3d 1200, 1208 (3d Cir. 1993) ("[T]he phrases in a search warrant must be read in context and not in isolation."). It then further identified the kinds of evidence sought: evidence concerning the planning or commission of only these offenses, communications

concerning them, the identity of the device's relevant users, the geographic and chronological context of the device's use, the user's state of mind, the identities of persons communicating with the device concerning the offenses, motive, and the identities of coconspirators or aiders and abettors. That is enough to cabin the search and the discretion of the executing officers. *See Stabile*, 633 F.3d at 234, 237; *Christine*, 687 F.2d at 753.[6]

***

Because Aponte has not made a "substantial preliminary showing" that the supporting affidavit contained a material falsehood, and the warrant particularly described the place to be searched and the things to be seized, his motion shall be denied.

An appropriate order follows.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

**WENDY BEETLESTONE, C.J.**

[6] The Government argues that even if the search warrant was overbroad, the evidence it yielded is nonetheless admissible under the good faith exception. *See United States v. Leon*, 468 U.S. 897 (1984). Because the warrant was not overbroad, the Court declines to consider whether the good faith exception applies here.